UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DEWAYNE DEMETRIUS ELLIS,

       Petitioner,

                               CASE NO. 2:06-CV-13772

  v.                           JUDGE DENISE PAGE HOOD
                               MAGISTRATE JUDGE PAUL J. KOMIVES

PATRICIA BARNHART,

       Respondent.[1]

_____/


**REPORT AND RECOMMENDATION**


*Table of Contents*

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.   REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.   *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.   *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.   *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    D.   *Sentencing Claims (Claims I, III & IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        1.   *Habitual Offender Sentence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            a. Sufficiency of the Habitual Offender Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            b. Inaccurate Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        2.   *Scoring of Sentencing Variables (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        3.   *Judicial Factfinding (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    E.   *Missing Witnesses (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    F.   *False Testimony (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        1.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
            a. Kraszewski Testimony Regarding Vehicle . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
            b. Cargill Testimony Regarding Number of Times Shot . . . . . . . . . . . . . . . . . . . . . 29
            c. Cargill Testimony Regarding Length of Hospital Stay . . . . . . . . . . . . . . . . . . . . . 31
            d. Cargill Testimony Regarding Amount of Money . . . . . . . . . . . . . . . . . . . . . . . . 31
    G.   *Sufficiency of the Evidence (Claim VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        1.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    H.   *Ineffective Assistance of Counsel (Claims II and VIII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        1.   *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        2.   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
            a. Failure to Challenge Habitual Offender Notice . . . . . . . . . . . . . . . . . . . . . . . . . 36

_____

    [1]By Order entered this date, Patricia Barnhart has been substituted in place of Blaine Lafler as the proper respondent in this action.

      b.  Failure to Challenge Cargill's Pre-Trial Identification . . . . . . . . . . . . . . . . . . . . . . 37
      c.  Failure to Thoroughly Cross-Examine Cargill . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      d.  Stipulation Regarding Felon in Possession Charge . . . . . . . . . . . . . . . . . . . . . . . 40
I.       *Cumulative Error (Claim IX)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
J.       *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
III.      <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*     *     *     *     *

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.    <u>REPORT</u>:

A.    *Procedural History*

    1.    Petitioner DeWayne Demetrius Ellis is a state prisoner, currently confined at the Thumb Correctional Facility in Lapeer, Michigan.

    2.    On October 9, 2003, petitioner was convicted of armed robbery, MICH. COMP. LAWS § 750.529; assault with intent to commit murder, MICH. COMP. LAWS § 750.83; felon in possession of a firearm, MICH. COMP. LAWS § 750.224f; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Wayne County Circuit Court. On October 21, he was sentenced as a third habitual offender, MICH. COMP. LAWS § 769.11, to concurrent terms of 30-50 years' imprisonment each on the robbery and assault convictions and 3½-5 years' imprisonment on the felon in possession convictions, and to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

    3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

    I.    APPELLANT DEWAYNE ELLIS IS ENTITLED TO BE RESENTENCED WHERE THE NOTICE OF INTENT TO ENHANCE SENTENCE (SUPPLEMENTAL INFORMATION) WAS FATALLY DEFECTIVE AND AN INVALID ENHANCED SENTENCE WAS IMPOSED BASED ON

2

INACCURATE INFORMATION IN VIOLATION OF DUE PROCESS OF LAW.

II.     APPELLANT DEWAYNE ELLIS IS ENTITLED TO BE RESENTENCED WHERE TRIAL COUNSEL FAILED TO CHALLENGE THE ACCURACY OF THE PRIOR CONVICTIONS IN THE NOTICE TO ENHANCE HIS SENTENCE IN VIOLATION OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

III.    DEFENDANT DEWAYNE ELLIS IS ENTITLED TO BE RESENTENCED BECAUSE THE STATUTORY SENTENCING GUIDELINES WAS MISSCORED AS TO OFFENSE VARIABLES 4 AND 6. THE SENTENCE IS A DEPARTURE FROM THE STATUTORY SENTENCING GUIDELINES WITHOUT COMPLIANCE WITH THE DEPARTURE REQUIREMENTS.

IV.     APPELLANT DEWAYNE ELLIS IS ENTITLED TO RESENTENCING BECAUSE THE SENTENCING JUDGE INCREASED THE STATUTORY SENTENCING GUIDELINE RANGE IN HIS CASE BASED ON FACTS WHICH WERE NOT PROVEN TO A JURY BEYOND A REASONABLE DOUBT IN VIOLATION OF HIS RIGHT TO A JURY TRIAL.  BLAKELY V WASHINGTON 542 US ___, 124 SCt 2531, ___ L ED 2D ___ (2004).

V.      APPELLANT DEWAYNE ELLIS WAS DENIED A FAIR TRIAL WHEN THE PROSECUTOR FAILED TO MAKE ANY ATTEMPT TO DISCOVER THE WHEREABOUTS OF TWO CRITICAL RES GESTAE WITNESSES AND PROVIDE THE INFORMATION TO THE DEFENSE AS REQUIRED BY STATUTE AND CONTRARY TO DUE PROCESS OF LAW.

VI.     A MANIFEST INJUSTICE HAS OCCURRED IN THIS CASE WHERE APPELLANT DEWAYNE ELLIS' CONVICTIONS WERE OBTAINED ON FALSE SWORN TESTIMONY IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW.  APPELLANT IS ENTITLED TO A NEW TRIAL.

VII.    THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT APPELLANT DEWAYNE ELLIS' CONVICTION FOR ASSAULT WITH THE INTENT TO MURDER AS REQUIRED BY THE DUE PROCESS CLAUSE.

VIII.   APPELLANT DEWAYNE ELLIS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED HIM BY THE FEDERAL

AND STATE CONSTITUTION AT TRIAL.  THEREFORE, HE IS
ENTITLED TO A NEW TRIAL AND/OR REMAND FOR A HEARING
PURSUANT TO <u>PEOPLE V GINTHER</u> 390 MICH 436 (1973).

IX.    THE CUMULATIVE EFFECT OF THE FOREGOING ERRORS DENIED
APPELLANT DEWAYNE ELLIS OF A FAIR TRIAL IN VIOLATION OF
DUE PROCESS OF LAW AND REQUIRES REVERSAL.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Ellis*, No. 252368, 2005 WL 839487 (Mich. Ct. App. Apr. 12, 2005) (per curiam).

4.    Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan

Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard

order.  *See People v. Ellis*, 474 Mich. 911, 705 N.W.2d 119 (2005).

5.    Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

on August 24, 2006.  As grounds for the writ of habeas corpus, he raises the nine claims that he

raised in the state courts.

6.    Respondent filed his answer on March 7, 2007.  He contends that petitioner's first

and fifth claims are barred by petitioner's procedural default in the state courts, and that all of the

claims are either without merit or not cognizable on habeas review.

B.    *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions arise from the April 8, 2003, shooting and robbery of Carmichael

Cargill.  The evidence adduced at petitioner's trial was accurately summarized in petitioner's brief

in the Michigan Court of Appeals:

. . . . Complainant Carmichael Cargill testified he was waiting on Lothrop Street for
a friend to come back from the store between 7 and 8 p.m. on April 8, 2003.  (10-7-
03 pp. 13-14) Cargill was familiar with the neighborhood since he lived there for
about five years.  He moved out of the neighborhood in 2002 but continued to visit
his friends there.  (10-7-03 p14).
        Cargill identified Appellant DeWayne Ellis as the guy who rode up on a bike,

4

got off the bike, pulled out a gun and told him that it was a stick-up. He had seen Appellant about "a hundred and something time" around the neighborhood but did not know his name. (10-7-03 pp15-16)

Cargill stated he never had any kind of confrontation with DeWayne Ellis before April 8, 2003. He never had any beef with him at all, no arguments over money or anything. (10-7-03 p16)

Cargill testified that after the Appellant pulled out a silver gun, he tried to break and run towards Hanover. The Appellant shot him in the back of his leg. He heard quite a few shots. Cargill got up and tried to run again after he got hit in the leg. The Appellant chased him and shot him some more times. (10-7-03 p17)

Cargill ran towards the Appellant after he got off the ground. The Appellant shot again and broke his leg. He did not know why he ran towards the Appellant. It was instinct. He fell in the middle of a driveway and the alley. He couldn't be sure about the time but it was still light outside. (10-7-03 p18)

As he was lying on the ground, the Appellant was about two and a half feet away. He stood over him and shot him three more times in the upper leg. The Appellant asked for money and Cargill took $25.00 from his pocket. (10-7-03 pp19-20)

Cargill testified that he was shot nine times and was hospitalized for about a month and a half. (10-7-03 p20)

Upon his release from the hospital, Cargill went to the police station and viewed a photo array. He identified the Appellant as the person who shot him nine times. (10-7-03 pp21-22) While in the hospital, Cargill told a Detective that he didn't know the shooter's name. He did not tell the Detective that he didn't know the man. (10-7-03 p23)

On cross-examination, Cargill testified he was outside his friend's house on Lothrop talking to Paul and a lady he knew. They all broke and ran when the Appellant came up on the bike. (10-7-03 pp24-26)

Cargill told the police about the two witnesses. He also told the police that the shooter's gun was a pistol. (10-7-03 p30)

After he was shot, Cargill laid on the sidewalk until two neighborhood guys whom he recognized, picked him up and drove him to the hospital. He didn't know their names. (10-7-03 p37)

Cargill spoke to a Detective after surgery. Earlier, he had spoken to police officers and gave them a description of the shooter. He did not know the height or weight of the perpetrator. He could not recall if he told the officers that it was somebody from the neighborhood. (10-7-03 pp37-38)

On June 6, 2003, Cargill went to the 13th Precinct and was interviewed by a Prosecutor. He believes the Detective brought in a book of pictures and let him look through them. He did not see anyone else from the neighborhood in the book except Appellant. (10-7-03 pp40-42)

Between the time he was shot and June 6, 2003, Cargill did not tell the police or prosecutor that he knew who shot him. He revealed this information on June 6, 2003 while at the 13th Police Precinct. He couldn't remember speaking to the

security guard at the hospital.  (10-7-03 p43)

Cargill indicated he spoke to Paul and the lady about a week before the trial. He confirmed it was on June 6, 2003, that he told the Prosecutor about these two witnesses who were present during the shooting.  (10-7-03 p44)

On redirect, Cargill testified that he saw the Appellant driving a yellow station wagon.  (10-7-03 p46) He told the Prosecutor that Paul Montgomery was present during the incident but he could not provide an address or a phone number. He only knew the lady from the neighborhood.  (10-7-03 pp46-47)

Cargill testified that he gave the money to the Appellant after he was shot him [sic] three more times and he demanded his money.  (10-7-03 p48)

Over the defense's objection, the Complainant testified that he was in critical condition.  Defense Counsel noted that there were no medical records.  (10-7-03 p49)

On recross-examination, Cargill indicated he didn't give Paul Montgomery's phone number to the police after he saw him last week because Montgomery didn't want to get involved.  (10-7-03 p50)

Next, Lance Sullivan, police officer, testified he assisted in the apprehension of the Appellant.  He actually came up with Appellant's name for the photo lineup as a possible suspect on June 6, 2003.  (10-7-03 p54)

Sullivan['s] attention was lead to the Appellant by Cargill's description of the suspect as "smaller black male, light complected, maybe five foot five to five foot seven, well trimmed beard, also wearing a colostomy bag."  This description matched the Appellant.  (10-7-03 p55)

Sullivan and investigator Ray Evans went to 1460 Calvert about a mile north of Lothrop.  They were in plain clothes and an unmarked vehicle.  They observed Appellant Ellis in a vehicle.  They arrested him.  (10-7-03 p56)

On cross-examination, Sullivan testified he arrested the Appellant on June 7, 2003.  He got the description of the man with a colostomy bag on June 6, 2003. He confirmed he spoke to Cargill at the precinct on the 6th.  He was present along with Investigator Fresh when Complainant Cargill viewed the photo lineup.  He did not recall if the Prosecutor was present or not.  (10-7-03 p57)

Sullivan didn't receive any information about possible witnesses from the Complainant.  Sullivan did not make a report regarding his interview with Cargill. However, he did make a report on the Appellant's arrest.  On the report, he noted the suspect unknown under the relationship between the victim and the perpetrator. Sullivan checked the box that indicated there were no witnesses.  (10-7-03 pp57-59)

On redirect examination, Officer Sullivan testified that Cargill didn't indicate when or how he became aware of the Appellant's colostomy bag.  The Officer didn't recall.  (10-7-03 p60)

Sullivan explained the notations on his report only related to the Appellant's arrest not the armed robbery.  (10-7-03 pp61-62)

The People recalled Complainant Cargill.  He testified he did not know the Appellant wore a colostomy bag during the hundred times he saw him.  It was brought to his attention while he was in the hospital.  He told Prosecutor Marcus Conner about the colostomy bag on June 6, 2003.  (10-7-03 pp75-76) Cargill stated

6

he became aware of the Appellant's colostomy bag through his ex-fiancee during his month and [a] half stay in the hospital. He had no personal knowledge that the Appellant wore a bag. (10-7-03 pp76-77)

It was at the 13th precinct that they were talking and Cargill said, "I hear that the guy was supposed to wear a colostomy bag." Cargill didn't know that the person who robbed him wore a colostomy bag or not. He confirmed his ex-fiancee was not present during the robbery. Cargill testified that he did not add the colostomy bag to the description when he spoke with the Prosecutor. He just said, "I heard that he wore a bag. I didn't say that he wore one." (10-7-03 pp78-79)

Out of the jury's presence, the People moved to waive Police Officer Anthony Jones who recovered a bullet that was retrieved from the Complainant; and Investigator Ray Evans, Officer Lance Sullivan's partner. (10-7-03 p83)

Detroit Police Investigator Rodney Fresh testified that he conducted a photo lineup with Complainant Cargill about 1:25 p.m. on June 6, 2003. Cargill identified the Appellant whom the police had detained. (10-7-03 pp86-87) Investigator Fresh did not prepare any report other than the lineup sheet.

Investigator Fresh testified that fellow Officer, Lance Sullivan, asked him, if he would conduct the lineup. Sullivan basically gave him the photo array. (10-7-03 p89)

Investigator Fresh did not question Cargill about the robbery before he showed him the photo array or have any discussion afterwards. There was no prosecutor present during the photo showup. (10-7-03 p89-90)

Detroit Police Officer Dean Rademaker went to Ford Hospital at approximately 7:55, 8 p.m. on April 8, 2003 to see Carmichael Cargill. He described the scene as chaotic. He was trying to gain information as the doctors were working on him. He received information from the lead physician that the Complainant was critical and put it in his report. (10-7-03 p93)

On cross-examination, Officer Rademaker testified that Cargill described a black male, twenty to twenty five, an unknown male, light complected and clean shaven. Mr. Cargill told him that there were no witnesses and the assailant was a stranger. He did not know how tall the person was or how much he weighed. Cargill said the man had a nickel-plated automatic. The Officer testified that he asked Cargill directly "if he had known who had done this to him, and he said at that time no." (10-7-03 pp95-96)

Cargill told him that the perpetrator rode up on a bike, stated it was a robbery and demanded money. The Complainant took $25 out of his pocket. The perpetrator produced a nickel plated automatic and shot him in the thigh. (10-7-03 pp96-97)

Rademaker noted the Complainant was alert and conscious during the interview. He observed the Complainant was struck in the right and left thighs and groin. (10-7-03 p101)

Officer-in-Charge James Kraszewski spoke to Cargill on April 9, 2003 at Ford Hospital. He did get information at that time but did not ask Cargill if he knew who did it. His notes indicate basically what happened. (10-7-03 pp105-106)

Kraszewski confirmed he heard Complainant Cargill's trial testimony that he

saw the Appellant driving a station wagon. The Officer checked with the Secretary of State and found four cars registered to the Appellant and one of them was a 1987 Mercury station wagon. (10-7-03 p106)

On cross-examination, Kraszewski agreed the Complainant told him that the robber took the money out of his pocket. He did not get a description because he didn't understand his answers. (10-7-03 p109) He testified that no one was sent to the crime scene because he didn't know where it was. He was able to determine the location after he spoke with the Complainant at the hospital on April 9, 2003. Then, he went to Lothrop Street. (10-7-03 p110)

After this witness, Defense Counsel stated she had no objection to the admission of a written stipulation, exhibit 2, that read:

"It is hereby stipulated that Defendant DeWayne Ellis, was convicted of a felony on July 16, 1997. It is further stipulated that less than five years have passed since all fines were paid, or all imprisonment has been served, or all terms of probation were completed, and Defendant's right to possess the firearm have not been restored pursuant to Michigan law." (10-7-03 p112)

The following morning, Earl Perry Martin, Ford Hospital security guard, testified that on April 8, 2003 he spoke with Carmichael Cargill in the emergency room. He saw Cargill had been shot several times. Cargill was not able to give him the name of the shooter. Cargill stated that he was walking down the street and an unidentified subject on a bike rode up on him and shot him several times. The individual informed him after he was shot that he was robbing him, took Cargill's money and fled the location. Cargill described a black male with a hooded sweater or jacket. (10-8-03 pp7-8)

On cross-examination, Security Guard Martin confirmed he got Cargill's address, phone number and social security number. In fact, Cargill told him that it was an unknown man, someone that he didn't know. Cargill indicated he was actually shot before the robbery took place. (10-8-03 pp9-10)

Next, Officer Jeffrey Zarously testified that he was not involved in the investigation of the assault of Carmichael Cargill or the Appellant's arrest. He did relay information he received on June 1, 2003, a couple days later, to Officer Lance Sullivan about the Appellant's whereabouts. On June 1, 2003, Zarously received information from a[n] unknown citizen that a subject wanted for a shooting who went by the name Wheezie lived at 1460 Calvert. In his report, Zarously indicated he gave this information to Officer Sullivan on the same day. (10-8-03 pp12-14)

Zarously testified that on June 7, 2003, Officer Sullivan came to him and said they arrested DeWayne Ellis. Sullivan asked him to make a report that he gave the information to him about Wheezie. Officer Zarously confirmed he did not identify Wheezie as DeWayne Ellis. Zarously did not know the subject's name. He did not know Wheezie or DeWayne Ellis. (10-8-03 pp14-15)

Zarously put the Appellant's name in his report as Wheezie because Officer Sullivan showed him a photo with DeWayne Ellis' name and then in parenthesis it had the name Wheezie. Officer Sullivan showed him the photo on June 1, 2003. (10-8-03 pp15-16)

8

Officer Zarously testified the unknown person only said, "Wheezie."  He did not mention DeWayne Ellis.  (10-8-03 p19).

Both sides rested.  After closing arguments, the Trial Court instructed the jury and deliberations began.  The next day, the jury found Appellant DeWayne Ellis guilty as charged.

Br. of Appellant, in *People v. Ellis*, No. 252368 (Mich. Ct. App.), at 1-11.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts

10

them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Sentencing Claims (Claims I, III & IV)*

Petitioner first raises several challenges to his sentences.  In Claim I, petitioner contends that the notice of intent to enhance was defective, and his enhanced sentence was based on inaccurate information.  In Claim III, petitioner argues that the trial court improperly scored two offense variables, and that his sentence therefore amounted to an upward departure from the sentencing guidelines range.  Finally, in Claim IV, he contends that his sentence was based on facts not proved to the jury beyond a reasonable doubt, in violation of his Sixth Amendment right to a jury trial.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Habitual Offender Sentence (Claim I)*

Petitioner first contends that his sentence as an habitual offender was improper because the supplemental information charging him as an habitual offender was defective, and because the sentence was based on inaccurate information.  As explained by the Michigan Court of Appeals, the habitual offender information filed by the prosecutor alleged that petitioner had two prior felony convictions: a 1997 conviction for assault with intent to rob, and a 2002 conviction for delivery of a controlled substance.  The presentence report prepared following petitioner's conviction, however, listed three prior felony convictions: a 1994 conviction for attempted receiving stolen property, and

11

1997 convictions for both armed robbery and assault with intent to rob while armed. The presentence report made no mention of the 2002 drug conviction. *See Ellis*, 2005 WL 839487, at *5, slip op. at 5. Petitioner contends that he was never convicted of a drug offense in 2002, and thus that the supplemental information was defective and he was sentenced on the basis of inaccurate information. The Michigan Court of Appeals rejected petitioner's claim, concluding the prosecutor could have amended the information to accurately reflect petitioner's criminal history, and that petitioner's substantial rights were not affected because he had at least two other felony convictions which supported the enhanced sentence. *See id.* The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a. Sufficiency of the Habitual Offender Notice

The old version of Michigan's habitual offender statute required that habitual offender status be charged as a crime and proven to a jury. *See People v. Morales*, 240 Mich. App. 571, 576-83, 618 N.W.2d 10, 13-16 (2000) (discussing history of MICH. COMP. LAWS §§ 769.10-.13 and case law applying those provisions). In 1994, however, the Michigan legislature amended the habitual offender statute to make habitual offender status a sentence enhancement rather than a separate crime. As the *Morales* court explained:

> The landscape of the law was again fundamentally altered when the Legislature amended the habitual offender statutes in 1994. Under the current statutory scheme, the issue of defendant's status as an habitual offender is no longer a jury question. Now, the issue is to be resolved by the trial court either at sentencing or at a separate hearing held postconviction on the underlying charge. MCL 750.13; MSA 28.1085. Additionally, the prosecutor is no longer required to file a supplemental information. Instead, the prosecutor may file a written notice of intent to seek sentence enhancement.

*Morales*, 240 Mich. App. at 583, 618 N.W.2d at 16. Thus, under Michigan law the prosecutor was not required to file an information charging petitioner with being an habitual offender.

As a matter of due process, petitioner was entitled only to reasonable notice of the prosecutor's intent to seek an enhancement based on petitioner's habitual offender status and an opportunity to challenge that status. *See Oyler v. Boles*, 368 U.S. 448, 452 (1962). The record makes clear that petitioner's status as an habitual offender as a basis for enhancing his sentence was set forth in the presentence report, and petitioner had the opportunity to address this issue at sentencing. Due process required nothing more, *see Oyler*, 368 U.S. at 452-54, and any failure by the prosecutor to comply with the Michigan habitual offender statute raises an issue of state law not cognizable on habeas review. *See Randolph v. Romanowski*, No. 2:06-CV-11201, 2007 WL 4181269, at *11 (E.D. Mich. Nov. 27, 2007) (Cleland, J.); *McCann v. Trombley*, No. 05-CV-72556, 2007 WL 2318730, at *14 (E.D. Mich. Aug. 10, 2007) (Steeh, J., adopting report of Komives, M.J.); *Taylor v. Jones*, No. 05-CV-73909, 2007 WL 1725384, at *12-*13 (E.D. Mich. June 13, 2007) (Edmunds, J.); *Ivory v. Jackson*, No. 04-CV-71279, 2005 WL 1030325, at *9 (E.D. Mich. Apr. 27, 2005) (Roberts, J.).

Further, although not a cognizable basis for habeas relief, petitioner's analysis of Michigan law is incorrect. In *People v. Ellis*, 224 Mich. App. 752, 569 N.W.2d 917 (1997), the court held that "the supplemental information [seeking an habitual offender enhancement] may be amended outside the statutory period only to the extent that the proposed amendment does not relate to the specific requirements of M.C.L. § 769.13, *i.e.*, the amendment may not relate to additional prior convictions not included in the timely filed supplemental information." *Ellis*, 224 Mich. App. at 757, 569 N.W.2d at 919 (parallel citation omitted). Although this language, at first glance, appears to support petitioner's argument, a closer examination of the *Ellis* decision shows that it is not on point. In *Ellis*, the prosecutor sought to add additional felonies, changing the defendant's status from a second

13

habitual offender to a fourth habitual offender, and thereby subjecting him to a greater potential

penalty than under the original information.  *See Ellis*, 224 Mich. App. at 757, 569 N.W.2d at 919.

Here, by contrast, had petitioner challenged the validity of any of the convictions listed in the

habitual offender information, the prosecutor would not have sought to add additional felonies which

would increase petitioner's sentence exposure; rather, the prosecutor would have sought only to

substitute one felony for another, without increasing the total number of underlying felonies

supporting the habitual offender enhancement.  The *Ellis* court itself distinguished this situation,

explaining that the *Ellis* case was

> distinguishable from *People v. Manning*, 163 Mich. App. 641, 415 N.W.2d 1 (1987),
> where the Court upheld an amendment of a supplemental information outside the
> fourteen-day rule [then in effect].  In *Manning*, the amended supplemental
> information corrected an error in the specific convictions that formed the basis of the
> habitual offender, fourth offense charge.  However, the amendment did not elevate
> the level of the supplemental charge.

*Ellis*, 224 Mich. App. at 757 n.2, 569 N.W.2d at 919 n.2.  The Michigan Court of Appeals has

recently explained this distinction, and indicated that an amendment to substitute one felony for

another, without increasing the total habitual offender level, is appropriate.  After examining the

decisions in *Ellis* and *Manning*, the court explained:

> Therefore, contrary to defendant's position on appeal, a recognized difference
> exists between an amendment of a notice to seek sentence enhancement that attempts
> to impose more severe adverse consequences to a defendant, and one that does not.
> After reading *Ellis* and *Manning* together, we conclude that *Ellis* does not preclude
> the amendment of a timely sentence enhancement information to correct a technical
> defect where the amendment does not otherwise increase the potential sentence
> consequences.
>
> In this case, the amendment information did not increase defendant's
> potential sentence because the amendment did not change defendant's habitual
> offender level. . . .  Because the amendment did not change in any way the potential
> consequences of a conviction, of which defendant had received proper notice, we
> conclude that the trial court properly denied defendant's motion challenging the
> amendment to the notice to seek sentence enhancement, and properly sentenced

14

defendant as a third habitual offender.

*People v. Hornsby*, 251 Mich. App. 462, 472-73, 650 N.W.2d 700, 706-07 (2002); *see also*, *People v. Smith*, No. 232671, 2002 WL 31376493, at *3 (Mich. Ct. App. Oct. 22, 2002); *People v. Barber*, No. 203130, 1999 WL 33444311, at *7 (Mich. Ct. App. May 21, 1999) (per curiam) (reaching same conclusion).[2] Thus, under Michigan law, had petitioner properly objected, the prosecutor could have merely substituted one of petitioner's other felony convictions. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Inaccurate Information

Nor can petitioner show that his sentence was based on inaccurate information. Petitioner's claim rests on the Supreme Court's decisions in *Townsend v. Burke*, 334 U.S. 736 (1948), and *United States v. Tucker*, 404 U.S. 443 (1972). In both of those cases, "the United States Supreme Court invalidated defendants' sentences because they were imposed by trial courts in reliance upon material false assumptions of fact." *Eutzy v. Dugger*, 746 F. Supp. 1492, 1504 (N.D. Fla. 1989) (discussing *Townsend* and *Tucker*); *accord Stewart v. Peters*, 878 F. Supp. 1139, 1144 (N.D. Ill. 1995) (same). *See generally*, *Tucker*, 404 U.S. at 448-49; *Townsend*, 334 U.S. at 740-41.

Here, however, petitioner cannot show that his sentence was imposed in reliance upon material false assumptions of fact. While it is true that the fact of petitioner's asserted 2002 drug conviction may have been false, this was not a material fact in the trial court's imposition of sentence. Rather, the operative fact was the existence of at least two prior felony convictions. The

---

[2]For the same reasons that *Ellis* does not support his claim, petitioner's reliance on *People v. Morales*, 240 Mich. App. 571, 618 N.W.2d 10 (2000), is misplaced. In that case, as in *Ellis*, the court simply held that § 769.13 creates a bright-line rule, requiring the filing of an habitual offender notice within 21 days. The court did not address amendment to replace one felony with another. This was the situation in *Manning*, which both the *Ellis* and *Hornsby* courts confirmed remains valid under Michigan law.

15

asserted 2002 drug conviction was not listed in the presentence report nor mentioned by the trial court in imposing sentence. As such, his sentence was not based on any material false assumption of fact. Further, even assuming that the trial court had considered the asserted 2002 drug conviction, petitioner would still be unable to show that his sentence was based on false assumption regarding a material fact. As the *Tucker* Court observed, the question in a case such as this is whether petitioner's sentence "might have been different if the sentencing judge had known that" the 2002 conviction did not exist. *Tucker*, 404 U.S. at 448. Thus, "[w]here enhancement could have been based on other convictions, reliance on an invalid one is harmless." *Webster v. Estelle*, 505 F.2d 926, 931 (5th Cir. 1974). Because it is undisputed that petitioner had several other felony convictions which would have supported his sentencing as an habitual offender, the trial court's reliance on the 2002 conviction, if indeed there was such reliance, was harmless. *See Lindsey v. Smith*, 820 F.2d 1137, 1154 (11th Cir. 1987); *Barnes v. Estelle*, 518 F.2d 182, 183 (5th Cir. 1975). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.     *Scoring of Sentencing Variables (Claim III)*

Petitioner next contends that the trial court improperly scored two offense variables, rendering his sentence an upward departure from the guidelines. This claim is not cognizable on habeas review.

A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan*

16

*Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Petitioner's claim that the court improperly scored the guidelines range raises an issue of state law that is not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also, Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

3.      *Judicial Factfinding (Claim IV)*

Petitioner next contends that his sentence violated his Sixth Amendment right to a jury trial because it was based on facts not found beyond a reasonable doubt by a jury. The Court should conclude that this claim is without merit.

Petitioner's claim is based on the Supreme Court's *Apprendi* line of cases. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. In *Blakely*, the Court considered the applicability of *Apprendi* to a state sentencing guidelines scheme similar to the United States Sentencing Guidelines. The state in that case argued that guidelines findings were not prohibited by *Apprendi* because *Apprendi* prohibited only factual findings at sentencing which increased the statutory maximum penalty to which the defendant was exposed. The Court in *Blakely* rejected this argument and struck down the state guidelines scheme, explaining that:

> the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge
> may impose *solely on the basis of the facts reflected in the jury verdict or admitted*

17

> *by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303-04 (citations omitted) (emphasis in original).

Finally, in *United States v. Booker*, 543 U.S. 220 (2005), the Court took the step logically suggested by *Blakely*, concluding that the United States Sentencing Guidelines are unconstitutional under *Apprendi* because they allow federal judges to impose sentences based on facts not found by a jury beyond a reasonable doubt. Two separate majorities formed the Court's decision. Justice Stevens delivered the opinion of the Court on the substantive question of whether the Guidelines are unconstitutional under *Apprendi*. Noting that there was no difference of constitutional significance between the Guidelines and the state guideline system at issue in *Blakely*, *see Booker*, 543 U.S. at 233, and rejecting the government's attempts to distinguish the two, *see id*. at 237-43, the merits majority concluded that the Guidelines violate the Sixth Amendment as interpreted in *Apprendi*. A separate majority joined an opinion authored by Justice Breyer, which contained the Court's decision on the remedial issue. The remedial majority concluded that the appropriate remedy for the constitutional violation was not to strike the Guidelines in their entirety, but to excise two statutory provisions which make the Guidelines mandatory. *See id*. at 245. Thus, under *Booker* the Guidelines remain advisory, and a federal district judge must consult the Guidelines before imposing sentence, but the judge is not bound to follow the Guidelines.

Petitioner contends that, because the trial court made the necessary findings on the sentencing guidelines, his sentence violates *Blakely*. The Court should conclude that petitioner is not entitled to habeas relief on this claim. Michigan law provides for an indeterminate sentencing

18

scheme, unlike the determinate sentencing schemes at issue in *Blakely* and *Booker*.  Under Michigan law the defendant is given a sentence with a minimum and a maximum sentence.  The maximum sentence is not determined by the trial judge but is set by law.  *See People v. Drohan,* 475 Mich. 140, 160-61, 715 N.W.2d 778, 789-90 (2006); *People v. Claypool,* 470 Mich. 715, 730 n.14, 684 N.W.2d 278, 286 n.14 (2004); MICH. COMP. LAWS § 769.8.  "[M]ichigan's sentencing guidelines, unlike the Washington guidelines at issue in *Blakely*, create a range within which the trial court must set the minimum sentence." *Drohan,* 475 Mich. at 161, 715 N.W.2d at 790.  Under Michigan law, only the minimum sentence must presumptively be set within the appropriate sentencing guidelines range. *See People v. Babcock,* 469 Mich. 247, 255 n.7, 666 N.W.2d 231, 236 n.7 (2003) (discussing MICH. COMP. LAWS § 769.34(2)).  Under Michigan law, the trial judge sets the minimum sentence, but can never exceed the maximum sentence. *See Claypool,* 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

*Blakely* is inapplicable here because *Blakely* is concerned only with the *maximum* penalty which is authorized by a jury's findings or a defendant's plea: if some additional factor increases the defendant's penalty beyond that which could be imposed solely on the basis of the jury's findings or the defendant's plea, *Blakely* requires that those facts be found by a jury beyond a reasonable doubt (or be themselves pleaded to by a defendant).  As explained above, unlike the guidelines scheme at issue in *Blakely*, the Michigan sentence guidelines help determine only the minimum portion of a defendant's indeterminate sentence.  The maximum is, in every case, the statutory maximum authorized by law.  *See Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14; MICH. COMP. LAWS § 769.8. Petitioner's conviction, therefore, contained all of the factual findings necessary to impose the statutory maximum on that charge. *See Drohan*, 475 Mich. at 162,

19

715 N.W.2d at 790 ("Thus, the trial court's power to impose a sentence is always derived from the jury's verdict, because the 'maximum-minimum' sentence will always fall within the range authorized by the jury's verdict.").

This being the case, petitioner's sentence did not violate *Blakely* even though the trial court made additional factual findings in imposing the minimum term of petitioner's imprisonment.  The Supreme Court has repeatedly made clear that the *Apprendi* rule is concerned only with the maximum sentence which is authorized by a jury's verdict or a defendant's plea.  As the Supreme Court explained in *Harris v. United States*, 536 U.S. 545 (2002):

> *Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime–and thus the domain of the jury–by those who framed the Bill of Rights.  The same cannot be said of a fact increasing the mandatory minimum (but not extending the sentence beyond the statutory maximum), for the jury's verdict authorized the judge to impose the minimum with or without the finding.

*Harris*, 536 U.S. at 557.  This distinction is important because the only issue under the Sixth Amendment is whether the judge is impinging on the role of the jury.  For this reason, the Court explicitly excepted indeterminate sentencing schemes such as Michigan's from its holding in *Blakely*.  Rejecting an argument raised by Justice O'Connor in dissent, the Court explained:

> Justice O'Connor argues that, because determinate sentencing schemes involving judicial factfinding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former. This argument is flawed on a number of levels.  First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power.  It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury.  Indeterminate sentencing does not do so.  It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty.  Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence–and that makes all the difference insofar as judicial

20

impingement upon the traditional role of the jury is concerned.

*Blakely*, 542 U.S. at 309 (citation omitted).

Under this reasoning, it is clear that Michigan's indeterminate sentencing guideline scheme, under which the maximum is established by statute and only the minimum term is based on judicial factfinding, does not violate the Sixth Amendment. *See Bellamy v. Curtin*, No. 1:06-CV-599, 2007 WL 527988, at *4 (W.D. Mich. Feb. 14, 2007); *Mays v. Trombley*, No. 2:06-CV-14043, 2006 WL 3104656, at *3 (E.D. Mich. Oct. 31, 2006) (Hood, J.); *Worley v. Palmer*, No. 2:06-CV-13467, 2006 WL 2347615, at *2 (E.D. Mich. Aug. 11, 2006) (Cohn, J.); *Toothman v. Davis*, No. 05-CV-74561, 2006 WL 2190515, at *2 (E.D. Mich. Aug. 1, 2006) (Edmunds, J.); *Drohan,* 475 Mich. at 164, 715 N.W.2d at 791-92; *Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

This rationale does not apply directly in the habitual offender context. In some cases, a sentence enhancement based on a Michigan defendant's prior crimes may actually increase the maximum sentence to which the defendant is exposed. *See* MICH. COMP. LAWS §§ 769.11-.12. However, this fact does not implicate *Apprendi* and *Blakely* here for two reasons. First, despite how the habitual offender statute may operate with respect to other crimes, here petitioner was charged with and convicted of armed robbery, a crime which already carried a maximum penalty of imprisonment for any term of years or life. *See* MICH. COMP. LAWS § 750.529. Thus, the jury's finding of guilt on the armed robbery charge authorized petitioner's sentence, regardless of any additional factual findings by the trial judge with respect to his habitual offender status.

Second, and more fundamentally, *Apprendi* is simply inapplicable to factual findings relating to a defendant's prior criminal record. The *Apprendi* holding explicitly exempts from the jury factfinding requirement the fact of a prior conviction: "*Other than the fact of a prior conviction*, any

21

fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. The Supreme Court has consistently referred to the *Apprendi* rule in this manner. *See Booker*, 543 U.S. at 244; *Blakely*, 542 U.S. at 303. Thus, the trial judge was permitted under *Apprendi* to find that petitioner had prior criminal convictions authorizing his sentence as an habitual offender. *See United States v. Sanders*, 207 Fed. Appx. 602, 613 (6th Cir. 2006); *United States v. Bradley*, 400 F.3d 459, 462-63 (6th Cir. 2005).

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his sentencing claim.

E.      *Missing Witnesses (Claim V)*

Petitioner next contends that he was denied a fair trial when the prosecutor failed to endorse or discover the whereabouts of two *res gestae* witnesses as required by Michigan law. This claim relates to Paul Montgomery and the unidentified lady, both of whom Cargill indicated were present at the time of the shooting. The Michigan Court of Appeals rejected petitioner's claim. With respect to the unknown lady, the court reasoned that "there is no indication in the record that the prosecutor had information concerning the identity of the unidentified woman." *Ellis*, 2005 WL 839487, at *1, slip op. at 2. With respect to Montgomery, the court reasoned that although his existence was known to the prosecutor and he therefore should have been listed as a *res gestae* witness, petitioner could not show that his substantial rights were affected because petitioner did "not contend that he was unaware of this witness, and [did] not give any basis for concluding that the witness could have provided testimony favorable to the defendant." *Id*. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

It is true that, at the time of petitioner's trial, Michigan law required a prosecutor to list all *res gestae* witnesses.  *See* MICH. COMP. LAWS §§ 767.40-.40a; *see also*, *People v. Jones*, 641 Mich. App. 659, 236 N.W.2d 531 (1975); *People v. Anderson*, 64 Mich. App. 218, 235 N.W.2d 746 (1975).  Under Michigan law, a *res gestae* witness is "one who was an eyewitness to some event in the continuum of a criminal transaction and whose testimony will aid in developing a full disclosure of the facts surrounding the alleged commission of the charged offense."  *People v. Hadley*, 67 Mich. App. 688, 690, 242 N.W.2d 32, 34 (1976).  The statute does not, however, require the prosecutor to call all listed witnesses.  In any event, any failure of the prosecutor with respect to a *res gestae* witness raises solely a claim of state law.  It is well established that errors of state law do not provide a basis for habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  Thus, petitioner's claim that the prosecutor violated state law regarding the production of res gestae witnesses is not cognizable on habeas review.  *See Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 601 (E.D. Mich. 2001) (Tarnow, J.).

Petitioner does not explicitly argue that the prosecutor's failure to produce these witnesses violated his rights under the Sixth Amendment's Confrontation and Compulsory Process Clauses.  Regardless, any such claim would be without merit.  The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor[.]" U.S. CONST. amend. VI.  With respect to the Confrontation Clause, under the Sixth Amendment "[a] defendant has no right to confront a 'witness' who provides no evidence at trial.  Nor is the government required to call all of the witnesses to a crime."  *United States v. Heck*, 499 F.2d 778,

23

789 n.9 (9th Cir. 1974) (citations omitted) (internal quotation omitted); *see also*, *United States v. Bryant*, 461 F.2d 912, 916 (6th Cir. 1972); *United States v. Polisi*, 416 F.2d 573, 579 (2d Cir. 1969); *Mitchell v. United States*, 359 F.2d 833, 836 n.3 (7th Cir. 1966).  For this reason, the Sixth Circuit and Judges of this Court have repeatedly found that the prosecution's failure to endorse or call a *res gestae* witnesses in accordance with Michigan law does not raise a constitutional claim cognizable on habeas review.  *See, e.g.*, *Smith v. Elo*, No. 98-1977, 1999 WL 1045877, at *2 (6th Cir. Nov. 8, 1999); *Moreno v. Withrow*, No. 94-1466, 1995 WL 428407, at *1 (6th Cir. July 19, 1995) (per curiam); *Lewis v. Jabe*, No. 88-1522, 1989 WL 145895, at *3 (6th Cir. Dec. 4, 1989) (per curiam); *Atkins v. Foltz*, No. 87-1341, 1988 WL 87710, at *2 (6th Cir. Aug. 24, 1988) (per curiam); *Johnson*, 159 F. Supp. 2d at 601.

With respect to the Compulsory Process Clause, as a general matter that Clause "grants a criminal defendant the right to call witnesses that are 'material and favorable to his defense.'" *Wong v. Money*, 142 F.3d 313, 324 (6th Cir. 1998) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).  Unfortunately, the Supreme Court has provided little guidance on the exact contours of the Compulsory Process Clause.  *See Pennsylvania v. Ritchie*, 480 U.S. 39, 55 & n. 12 (1987) (noting that the Compulsory Process Clause has rarely been a factor in the Court's decisions).  Nevertheless, some general principles do exist to guide the Court's determination.  First, as a general matter the clause establishes, "at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt."  *Id*. at 56.  Second, it is clear that the right to compulsory process is not absolute; thus, in certain circumstances a witness may be precluded from testifying as a sanction for defendant's failing to comply with a discovery

24

order, *see Taylor v. Illinois*, 484 U.S. 400, 410-14 (1988), and testimony is subject to general evidentiary rules such as those governing relevance and privilege, *see Washington v. Texas*, 388 U.S. 14, 23 n.21 (1967); *Smith v. Cromer*, 159 F.3d 875, 882 (4th Cir. 1998). Because petitioner never sought to present Bond as a witness, his right to present a defense was not violated.

To the extent that petitioner claims he was entitled to question these witnesses as a matter of the Compulsory Process Clause, the claim fails. First, petitioner was not denied the court's assistance in locating these witnesses and assuring their appearance at trial. Petitioner never attempted to call the witnesses, nor when it became apparent at trial that the witnesses existed did he request a continuance to locate the witnesses and the court's assistance in doing so. *See Green v. Estelle*, 488 F.2d 918, 920 (5th Cir. 1973) (no denial of compulsory process where defendant did not attempt to call witness or ask for a continuance to do so, and the "state court was left totally unaware of the defendant's desire to call" the witness); *United States v. Mickens*, 837 F. Supp. 745, 748 (S.D. W. Va. 1993), *aff'd*, 53 F.3d 329 (4th Cir. 1995). Further, as the Supreme Court has explained, "more than mere absence of testimony is necessary to establish a violation of the right [to compulsory process]." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 866 (1982). The Sixth Amendment does not provide a defendant the right to process for obtaining any witness, only "witnesses in his favor." U.S. CONST. amend. VI. "This language suggests that [a defendant] cannot establish a violation of his constitutional right to compulsory process merely by showing that [he was deprived of witnesses' testimony]. He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *Valenzuela-Bernal*, 458 U.S. at 867. Here, petitioner has made no showing that these witnesses could have offered any favorable, material, and noncumulative evidence in support of his defense. *See Valenzuela-Bernal*,

25

458 U.S. at 873 (defendant must show that the evidence "would have been material and favorable in ways not merely cumulative to the testimony of available witnesses."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *False Testimony (Claim VI)*

Petitioner next contends that his conviction was based on the presentation of perjured testimony. Specifically, petitioner contends that false evidence was presented by Officer James Kraszewski regarding his ownership of a station wagon which Cargill saw petitioner driving after the robbery, and that Cargill testified falsely that he was shot nine times and stayed in the hospital for a month and half. In support of his claim, petitioner offers the Henry Ford Hospital records reflecting Cargill's treatment.[3] The Michigan Court of Appeals rejected petitioner's claims. With respect to petitioner's ownership of a station wagon, the court reasoned that "[b]ecause Officer Kraszewski testified that Secretary of State records indicated that *four* different vehicles were registered to defendant, defendant's reliance on documentation showing that he owned a four-door sedan does not demonstrate that Officer Kraszewski falsely testified that a station wagon was registered to defendant." *Ellis*, 2005 WL 839487, at *2, slip op. at 2. With respect to Cargill's testimony, the court found that the medical records did not support petitioner's claim, because Cargill did not definitively testify that he was shot nine times, but testified only that he was shot "approximately nine times." *See id.* The court also concluded that the length of time Cargill spent in the hospital was not relevant to the principal issue in the case–petitioner's identity as the

---

[3]By Order entered this date, I have granted petitioner's motion to expand the record to include this medical documentation.

shooter–and thus did not provide a basis for relief. *See id.* The Court should conclude that petitioner is not entitled to habeas relief on this claim.

      1.    *Clearly Established Law*

It is well established that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted); *accord Napue v. Illinois*, 360 U.S. 264, 271 (1959). This is true whether the false testimony goes to the defendant's guilt or to a witness's credibility, *see Napue*, 360 U.S. at 270, and it matters not whether the prosecution directly elicits the false testimony or merely allows false testimony to go uncorrected, *see id.* at 269. It is equally well established, however, that petitioner bears the burden of proving that the testimony amounted to perjury. As the Fourth Circuit has explained, "[a] defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured. Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987); *accord United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990) ("[N]ot every testimonial inconsistency that goes uncorrected by the government establishes a constitutional violation."); *Horton v. United States*, 983 F. Supp. 650, 657 (E.D. Va. 1997); *United States v. Hearst*, 424 F. Supp. 307, 318 (N.D. Cal. 1976). Thus, to succeed on this claim petitioner must show that: (1) the prosecutor presented evidence which was false; (2) the prosecutor knew of the falsity; and (3) the evidence was material. *See Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1999). As the *Verser* court further explained, to establish a constitutional violation petitioner must show that the "inconsistent testimony amounted to perjury, 'the willful assertion

27

under oath of a false, material fact.'" *Verser*, 916 F.2d at 1271 (quoting *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984)); *see also*, *Horton*, 983 F. Supp. at 657 (quoting *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995)) (in order to establish *Napue* violation defendant must show that the government knowingly used perjured testimony, perjury being "false testimony concerning a material matter, 'given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory.'"). In other words, petitioner must show that the testimony was "indisputably false." *Byrd v. Collins*, 209 F.3d 486, 817-18 (6th Cir. 2000).

    2.    *Analysis*

With the possible exception of Cargill's testimony regarding the length of time he spent in the hospital, petitioner has failed to show that the prosecution knowingly presented false testimony. With respect to the length of Cargill's hospital stay, even if Cargill's testimony was false, it was not material.

### a. Kraszewski Testimony Regarding Vehicle

Officer Kraszewski testified that, after being informed by Cargill that petitioner was driving a station wagon, he checked with the Secretary of State and confirmed that petitioner owned four cars, one of which was a 1987 Mercury station wagon. *See* Trial Tr., Vol. II, at 106. Petitioner contends that this testimony was false, relying on a title report which shows him owning a 1987 Mercury Grand Marquis sedan. However, Kraszewski testified that petitioner owned four vehicles, a fact which petitioner does not dispute. Thus, the existence of a single title report for a car which is not a station wagon does not call into question Kraszewski's testimony that a station wagon was registered to petitioner, much less does it show that Kraszewski's testimony was "indisputably false." Thus, petitioner is not entitled to habeas relief based on this testimony.

*b.  Cargill Testimony Regarding Number of Times Shot*

Petitioner next contends that Cargill's testimony that he was shot nine times was false, and that Cargill was shot only three times.  At trial, Cargill first testified equivocally regarding the number of times he was shot, saying that it was "[a]pproximately nine times."  Trial Tr., Vol. II, at 20.  During redirect examination, the prosecutor asked: "Nonetheless you were shot nine times, right?"  Cargill responded, "Yes, sir."  Petitioner, relying on the medical records of Cargill's treatment, contends that Cargill was shot only three times.  However, the medical records, while they are not conclusive regarding the number of times that Cargill was shot, do establish that he was shot more than three times.  In particular, petitioner relies on the Emergency Department Assessment Sheet dated April 9, 2003, which indicates that Cargill presented with "multiple GSW to right thigh, left posterior upper thigh, left knee, right scrotal area."  From the start, this report suggest that Cargill was shot in four areas of his body, not three.  Further, the report does not state how many gunshot wounds were in each area.  For example, an Operative Report dated April 12, 2003, indicates "multiple gunshot wounds to his right femur" alone, suggesting that even if Cargill was shot in only three areas of his body, there were more than three shots.  Various reports diagraming the wounds to Cargill's groin and lower extremities identify anywhere from 6 to 9 wounds, although these reports do not distinguish entrance and exit wounds, so it cannot be determined the number of bullets responsible for all the wounds.

In short, the medical records establish that Cargill was shot more than three times, although the exact number of times he was shot, as opposed to the number of wounds caused by the shots, cannot be determined.  To be sure, the number of times that Cargill was shot was somewhat relevant to petitioner's intent with respect to the assault with intent to commit murder charge.  However, it

29

is the fact of the multiple shots, rather than there exact number, which was relevant. The difference between nine shots and, say, six or seven shots, would not have been material to the jury's determination of petitioner's intent. Thus, the medical records fail to establish that Cargill's testimony was "indisputably false" in any way which was material to the jury's verdict.

Further, there is nothing to suggest that the prosecutor knew that Cargill's testimony regarding the number of times he was shot was false. Cargill repeatedly testified at both the preliminary examination and the trial that he was shot about nine times, or that he was told he was shot nine times. The medical records were not introduced at trial, nor were any of Cargill's treating physicians called as witnesses. Thus, there is nothing to suggest that the prosecutor had any reason to doubt the veracity of Cargill's testimony. As the Sixth Circuit has explained, in order for a witness's perjury at trial to constitute a basis for habeas relief, the petitioner must show "prosecutorial involvement in the perjury." *Burks v. Egeler*, 512 F.2d 221, 229 (6th Cir. 1975). The Sixth Circuit has repeatedly reaffirmed the requirement that a petitioner show prosecutorial involvement in the perjury. *See, e.g.*, *King v. Trippett*, 192 F.3d 517, 522 (6th Cir. 1999); *Ford v. United States*, No. 94-3469, 1994 WL 521119, at *2 (6th Cir. Sept. 23, 1994); *Akbar v. Jago*, No. 84-3540, 1985 WL 13195, at *1 (6th Cir. Apr. 10, 1985); *Roddy v. Black*, 516 F.2d 1380, 1383 (6th Cir. 1975). And the Supreme Court has repeatedly characterized the Due Process Clause only as barring conviction on the basis of perjury known by the prosecution to be such. *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (emphasis added) ("[I]t is established that a conviction obtained through use of false evidence, *known to be such by representatives of the State*, must fall under the Fourteenth Amendment."); *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added) (due process is violated by the "*knowing* use of perjured testimony."); *see id.* at 103-04 & nn. 8-9

30

(discussing cases).[4]  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c.  Cargill Testimony Regarding Length of Hospital Stay

Petitioner next contends that Cargill perjured himself when he testified that he stayed in the hospital for about a month and a half, *see* Trial Tr., Vol. II, at 20, when the medical records show that petitioner was discharged on April 24, 2003, after a stay of just over two weeks.  Even assuming, however, that Cargill perjured himself regarding the length of his hospital stay, petitioner cannot show that the Michigan Court of Appeals was unreasonable in determining that this testimony was not material.  As the court of appeals observed, the length of Cargill's stay in the hospital was not relevant to the elements of any of the charges against petitioner, nor was it relevant to any of the issues in the case.  The principal issues were petitioner's identity as the perpetrator and his intent with respect to the assault charge.  The length of Cargill's hospital stay was simply irrelevant to these issues.  Thus, petitioner is not entitled to habeas relief on this claim.

### d.  Cargill Testimony Regarding Amount of Money

Finally, petitioner contends that Cargill committed perjury regarding the amount of money he had at the time of the robbery.  According to petitioner, Cargill testified that he had only $25.00 on his person at the time of the robbery, while the hospital admittance records show that Cargill had $115.00 at the time of his admission after the robbery.  The problem with this claim, however, is that

---

[4]At a minimum, "[t]he Supreme Court has never held that due process is offended by a conviction resting on perjured testimony where the prosecution did not know of the testimony's falsity at trial."  *LaMothe v. Cademartori*, No. C 04-3395, 2005 WL 3095481, at *5 (N.D. Cal. Nov. 11, 2005) (citing *Jacobs v. Scott*, 513 U.S. 1067 (1995) (Stevens, J., dissenting from denial of certiorari) (noting that the Supreme Court has yet to consider the question of whether due process is violated by a conviction based on perjured testimony regardless of the prosecutor's knowledge)).  Thus, the court of appeals's rejection of petitioner's perjury claim did not violate any clearly established law under § 2254(d)(1). *See Schaff v. Snyder*, 190 F.3d 513, 530 (7th Cir. 1999).

Cargill never testified that he only had $25.00 at the time of the robbery.  Rather, he testified that while petitioner was robbing him, he told petitioner that that was all he had on him.  *See* Trial Tr., Vol. II, at 20 ("I said I ain't got but $25; please don't kill me.").  It is not surprising that Cargill may have attempted to minimize the amount of money petitioner took from him by telling him that he only had $25.00.  There was no testimony from Cargill regarding the total amount of money that he, in fact, possessed at the time of the robbery.  Thus, petitioner cannot show that Cargill testified falsely regarding this matter.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his perjured testimony claims.

G.      *Sufficiency of the Evidence (Claim VII)*

Petitioner next contends that the prosecution presented insufficient evidence to support his conviction for assault with intent to commit murder.  Specifically, he argues that there was insufficient evidence presented to show that he actually intended to kill Cargill.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the

prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Michigan law provides that "[a]ny person who shall assault another with intent to commit the crime of murder, shall be guilty of a felony[.]" MICH. COMP. LAWS § 750.83. Under this provision, "the crime of assault with intent to commit murder requires proof of three elements: '(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder.'" *Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (quoting *People v. Plummer*, 229 Mich. App. 293, 581 N.W.2d 753, 759 (1998); *People v. Hoffman*, 225 Mich. App. 103, 570 N.W.2d 146, 150 (1997)). As with other mental-state elements, intent to kill need not be proved by direct evidence,

33

but rather may be proved by circumstantial evidence and reasonable inferences drawn from the evidence. *See Warren*, 161 F.3d at 360; *Hoffman*, 225 Mich. App. at 111, 570 N.W.2d at 150.

      2.    *Analysis*

Petitioner contends that the evidence was insufficient to show his intent to kill because the evidence establishes that the purpose of the entire episode was to rob Cargill, not to kill him. The Michigan Court of Appeals rejected petitioner's claim, reasoning that "[t]he complainant's testimony that defendant shot him multiple times with a gun at close range, robbed him, and then left him lying in the street, viewed in a light most favorable to the prosecution, was sufficient to support an inference that defendant intended to kill him." *Ellis*, 2005 WL 839487, at *3, slip op. at 3. This determination was reasonable.

As explained above it is well established that "[t]he specific intent to kill may be proven by inference from any facts in evidence." *Warren*, 161 F.3d at 361 (internal quotation omitted). Specifically, and in addition to other factors, the Court "may take into consideration 'the nature of the defendant's acts constituting the assault . . . [and] whether the instrument and means used were naturally adapted to produce death[].'" *Id.* (quoting *People v. Taylor*, 422 Mich. 554, 375 N.W.2d 1, 8 (1985)). Thus, even in the absence of any evidence that he expressed an intent to kill or succeeded in killing Cargill, petitioner's act of firing a gun at Cargill multiple times and at close range is sufficient evidence from which the finder of fact could infer beyond a reasonable doubt that petitioner intended to kill the victim. *See Johnigan v. Elo*, 207 F. Supp. 2d 599, 608 (E.D. Mich. 2002) (Steeh, J.); *People v. Ritsema*, 105 Mich. App. 602, 609, 307 N.W.2d 380, 383 (1981); *People v. Johnson*, 54 Mich. App. 303, 304, 220 N.W.2d 705, 706 (1974). Further, the fact that the evidence may have supported another version of events–that petitioner's intent was solely to rob

34

Cargill–is irrelevant; the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient. *See Jackson*, 443 U.S. at 326. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.    *Ineffective Assistance of Counsel (Claims II and VIII)*

Petitioner next contends that his counsel rendered constitutionally ineffective assistance at trial. Specifically, petitioner contends that counsel was ineffective for: (1) failing to challenge the sufficiency of the prosecutor's habitual offender notice; (2) failing to challenge Cargill's pre-trial identification; (3) failing to thoroughly cross-examine Cargill; and (4) stipulating to the elements of the felon in possession offense. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *See id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that

counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.   *Analysis*

a. *Failure to Challenge Habitual Offender Notice*

Petitioner contends that counsel was ineffective for failing to challenge the sufficiency of the prosecutor's habitual offender notice. As explained above in connection with petitioner's substantive challenge to the habitual offender notice, however, even if counsel had objected the prosecutor would have been able to amend the notice to include petitioner's other, valid convictions, which in turn would have been sufficient to support the habitual offender enhancement. *See Ellis*, 2005 WL 839487, at *5, slip op. at 5-6. In analyzing petitioner's ineffective assistance of counsel claims, this expression of state law is binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). Because the prosecutor would have been permitted under state law to substitute one of petitioner's other convictions to support his enhanced

36

sentence even if counsel had objected, petitioner cannot show that counsel was ineffective in failing to challenge the habitual offender information.  *See Tucker v. Duckworth*, No. 92-2723, 1993 WL 139003, at *4 (7th Cir. Apr. 30, 1993); *Childress v. Lynaugh*, 842 F.2d 768, 772 (5th Cir. 1988).

### b.  Failure to Challenge Cargill's Pre-Trial Identification

Petitioner next contends that counsel was ineffective for failing to challenge Cargill's in-court identification as tainted by an impermissibly suggestive pretrial identification procedure.  The Michigan Court of Appeals rejected this claim, explaining that petitioner did "not explain why the pre-trial identification procedure was unduly suggestive," and that in any event because Cargill was familiar with petitioner from having seen him around the neighborhood numerous times, "any suggestion that the complainant's in-court identification was tainted by a pretrial identification procedure would have been meritless."  *Ellis*, 2005 WL 839487, at *4, slip op. at 4.  This determination was reasonable.

A pre-trial identification procedure violates the Constitution if "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law."  *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967).  Similarly, a subsequent in-court identification following an impermissibly suggestive pre-trial identification is unconstitutional if the pre-trial "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1968).  *See generally*, *Neil v. Biggers*, 409 U.S. 188, 197-98 (1972).  A suggestive line-up alone, however, does nor require exclusion of identification evidence.  "The admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability."

37

*Manson v. Brathwaite*, 432 U.S. 98, 106 (1977). Thus, the central question in a case where the pre-trial identification procedure is impermissibly suggestive is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199; *accord Manson*, 432 U.S. at 114. The factors relevant to this "totality of the circumstances" analysis include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200; *accord Manson*, 432 U.S. at 114. Thus, a court must "follow[] a two-step analysis in determining whether an identification is admissible." *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir. 2001). First, the court must "consider whether the identification procedure was suggestive." *Id*. If it was not, the "identification testimony is generally admissible without further inquiry," and any question as to the reliability of the identification "goes to the weight of the evidence, not its admissibility." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990).

Here, petitioner has presented no argument that the photographic line-up was unduly suggestive in that it was conducted in such a way as to create a probability of irreparable misidentification, and nothing in the record provides any evidence that the photographic array was unduly suggestive. "Generally if identification procedures prior to trial were not unduly suggestive, questions as to the reliability of a proposed in-court identification affect only the identification's weight, not its admissibility." *United States v. Matthews*, 20 F.3d 538, 547 (2d Cir. 1994); *see also*, *Crozier*, 259 F.3d at 510. Here, Cargill's in-court identification was subject to cross-examination by petitioner's counsel, and counsel argued that Cargill's identification was unreliable. Because

38

there is simply no evidence that Cargill participated in any unduly suggestive pre-trial identification procedure, petitioner cannot show that he was prejudiced by counsel's failure to more thoroughly investigate this matter. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Failure to Thoroughly Cross-Examine Cargill

Petitioner also contends that counsel was ineffective for failing to thoroughly cross-examine Cargill. Specifically, petitioner contends that counsel should have used the medical records to impeach Cargill's testimony regarding the amount of money he had, the number of times he was shot, and the length of his hospital stay. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

"[C]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002) (Friedman, J.). "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Id.; accord Millender v. Adams*, 187 F. Supp. 2d 852, 872 (E.D. Mich. 2002) (Rosen, J.). Because "the conduct of examination and cross-examination is entrusted to the judgment of the lawyer," a reviewing court "on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). Here, the record shows that counsel ably cross-examined the prosecution's witnesses, and particular that she thoroughly cross-examined Cargill regarding the principal issue in the case–petitioner's identity as the perpetrator. And, as noted above, the records upon which petitioner relies were not as contradictory to Cargill's testimony as petitioner claims. That some

particular avenues of questioning were not fully explored does not support a finding that counsel's performance was deficient. *See Poyner v. Iowa*, 990 F.2d 435, 438 (8th Cir. 1993) (counsel not ineffective for failing to "develop every bit of testimony through all available inconsistent statements."); *Millender*, 187 F. Supp. 2d at 872; *Johnson v. Hofbauer,* 159 F. Supp. 2d 582, 607 (E.D. Mich. 2001) (Tarnow, J.). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### d. Stipulation Regarding Felon in Possession Charge

Petitioner finally contends that counsel was ineffective for entering into a stipulation regarding his status as a felon for purposes of the felon in possession charge. Specifically, the stipulation stated:

> It is hereby stipulated that Defendant DeWayne Ellis, was convicted of a felony on July 16, 1997. It is further stipulated that less than five years have passed since all fines were paid, or all imprisonment has been served, or all terms of probation were completed, and Defendant's right to possess the firearm have not been restored pursuant to Michigan law.

Trial Tr., Vol. II, at 112. Petitioner contends that this stipulation amounted to a plea of guilty to the felony in possession charge. He does not dispute that counsel had a legitimate reason for stipulating to the existence of the prior felony to mitigate the prejudicial impact of evidence relating to the prior felony, but contends that counsel's further stipulation that his rights had not been restored diminished the prosecutor's burden of proof. *See* Pet., at 13. However, the same reasons that support counsel's stipulation to the existence of the prior felony supports counsel's stipulation to the fact that petitioner's right to possess a firearm had been restored, because requiring the prosecutor to prove the latter would have permitted the introduction of the same type of prejudicial evidence which counsel sought to avoid by entering into the stipulation regarding the prior felony

conviction. Further, petitioner does not suggest that his right to possess a firearm had, in fact, been restored, and petitioner therefore cannot show a reasonable probability that the result of his trial would have been any different had counsel not made this stipulation and required the prosecutor to prove that his right to possess a firearm had not been restored.[5]

Petitioner also argues that counsel was ineffective for failing to request a cautionary instruction limiting the jury's use of this stipulation. Even assuming, however, that counsel should have requested such an instruction, petitioner cannot show that he was prejudiced by the absence of a limiting instruction. "[T]he evidence of [petitioner's] prior conviction was necessary to prove the crime charged, and otherwise added little to the case against him. The government did not expound on the specifics of the crime, or suggest to the jury that [petitioner's] prior conviction showed a propensity to commit the crime with which he was charged." *United States v. Hope*, 906 F.2d 254, 264 (7th Cir. 1990). In these circumstances, petitioner cannot show that he was prejudiced by counsel's failure to request a limiting instruction. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.      *Cumulative Error (Claim IX)*

Finally, petitioner contends that he was denied a fair trial by the cumulative effect of the errors identified in his habeas application. The Court should conclude that petitioner is not entitled to habeas relief on this basis. It is true that "[e]rrors which standing alone may be deemed harmless or insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting which is fundamentally unfair." *Payne v. Janasz*, 711 F.2d 1305, 1316 (6th Cir. 1983)

---

[5]There is no merit to petitioner's argument that counsel's stipulation had the effect of "relieving the prosecutor of proving all the elements of the crime of felon in possession." Pet., at 13. On the contrary, the principal issue in the case was whether petitioner was the perpetrator at all, and counsel's stipulation regarding the existence of a prior felony certainly did not concede this element.

(Jones, J., dissenting); *accord Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983). This rule, however, applies only to constitutional errors; the accumulation of non-errors cannot collectively amount to a violation of due process. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999); *McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995); *Fero v. Kerby*, 39 F.3d 1462, 1475 (10th Cir. 1994). As noted and discussed in this Report, none of petitioner's claims establish constitutional error, and thus his cumulative error claim fails.

J.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR

72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 3/23/09


The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on March 23, 2009.

s/Eddrey Butts
Case Manager